ST CLAIR COUNTY EDUCATION ASSOCIATION v ST CLAIR COUNTY
INTERMEDIATE SCHOOL DISTRICT

Docket No. 218135. Submitted August 8, 2000, at Lansing. Decided May 1,
2001, at 9:00 A.M.

The St. Clair County Education Association (the union) brought an
unfair labor practice charge against the St. Clair County Intermedi-
ate School District (ISD), alleging that the ISD violated subsection
10(1)(a) of the public employment relations act (PERA), MCL
423.210(1)(a), by interfering with a person's rights to join the union
and to seek the union's assistance in obtaining a salary increase. A
Michigan Employment Relations Commission (MERC) hearing ref-
eree agreed with the union and issued a decision and recom-
mended order to that effect. The MERC thereafter issued a decision
and order adopting the hearing referee's decision and recom-
mended order. The union also brought an unfair labor practice
charge against the ISD and the Academy for Plastics Manufacturing
Technology (the academy), a public school academy formed by the
ISD, alleging violation of subsection 10(1)(e) of the PERA, MCL
423.210(1)(e), as a result of the failure to bargain with the union
with regard to the union's request to represent the employees of
the academy in collective bargaining. A MERC hearing referee issued
a decision and recommended order, finding no violation of subsec-
tion 10(1)(e) of the PERA. The referee determined that the academy
and the ISD were not joint employers of the academy's employees
and recommended dismissal of the union's petition for unit clarifi-
cation. The MERC adopted the hearing referee's decision and recom-
mended order in the same decision and order that addressed the
union's unfair labor practice charge regarding the alleged violation
of subsection 10(1)(a) of the PERA. The MERC also denied the union's
motion to reopen the record with regard to the alleged violation of
subsection 10(1)(e). The ISD appealed from the decision and order
with regard to the alleged violation of subsection 10(1)(a) and the
union cross appealed from the decision and order regarding the
alleged violation of subsection 10(1)(e), the dismissal of the peti-
tion for unit clarification, and the denial of the motion to reopen
the record.

The Court of Appeals *held*:

The decision and order must be affirmed with regard to both the ISD's appeal and the union's cross appeal.

1. The hearing referee and the MERC properly found that the ISD's conduct violated subsection 10(1)(a) when the ISD attempted to coerce an ISD employee while the employee was engaged in the exercise of her rights guaranteed in § 9 of the PERA, MCL 423.209.

2. The MERC correctly found that the ISD and the academy did not violate subsection 10(1)(e) in refusing to bargain with the union with regard to the academy's employees on the basis that the ISD and the academy did not jointly employ the academy's employees. The MERC correctly dismissed the union's petition for unit clarification.

3. The additional evidence that the union sought to introduce by reopening the record would not prove that the ISD and the academy were joint employers of the academy's employees and thus would not have had any effect on the administrative proceedings. The MERC did not err in denying the motion to reopen the record.

·Affirmed.

LABOR RELATIONS — COLLECTIVE BARGAINING — JOINT-EMPLOYER DOCTRINE.

The joint-employer doctrine may be employed to enforce a labor agreement entered into through collective bargaining against a party that did not sign the agreement; characteristics to be examined to determine whether a party that did not sign the agreement exhibits the characteristics of an employer and may be deemed the employer under the agreement include the party's power to select, engage, or dismiss the employees, the party's power to control the employees' conduct, and the party's payment of the employees' wages.

*Amberg, McNenly, Firestone and Lee, P.C.* (by *Joseph H. Firestone*), for the St. Clair County Education Association.

*Scott C. Moeller*, for the St. Clair County Intermediate School District.

*Fletcher DeGrow, P.C.* (by *Gary A. Fletcher* and *John D. Tomlinson*), for the Academy for Plastics Manufacturing Technology.

Before: M. J. KELLY, P.J., and WHITBECK and COLLINS, JJ.

WHITBECK, J. The St. Clair Intermediate School District (ISD) appeals as of right and challenges the decision of the Michigan Employment Relations Commission (MERC) to affirm one of two unfair labor practice charges brought by the St. Clair County Education Association (the union). The union cross appeals the MERC's decision to dismiss the second unfair labor practice charge, its petition for unit clarification, and its motion to reopen the record. We affirm the MERC decision with regard to the appeal and the cross appeal.

### I. BASIC FACTS AND PROCEDURAL HISTORY

#### A. JANE JOHNSON'S UNFAIR LABOR PRACTICE CHARGE

Jane Johnson has been a registered nurse at the ISD's Woodland Development Center, a center for mentally and physically impaired students, for approximately seventeen years. She is the only registered nurse the ISD employs. Johnson repeatedly sought to have her position included among the positions for which the union would bargain in contract negotiations. The union shared Johnson's goal of having her position added to the bargaining unit. The union's efforts to bargain on this issue were, however, unsuccessful.

According to ISD Superintendent Joe Caimi, several years ago Johnson had asked him for teacher's pay, but he denied her request. Johnson was always paid the same salary as teachers in the bargaining unit and had received all across-the-board pay increases that teachers in the unit received. However, Johnson, whose pay was equivalent to a teacher at step three, received no step increases in pay. Apparently, if John-

son had received these step pay increases, she would be paid at least $16,000 more a year.

In May 1997, the union and the ISD began negotiating a new collective bargaining agreement. The union presented its initial proposals to the ISD, including a proposal to bring Johnson's nursing position into the bargaining unit. Shortly thereafter, Caimi discussed the proposal with Janice Frederick, the ISD's director of special education and Johnson's supervisor. Caimi assumed that Johnson wanted to join the bargaining unit because she believed that unit membership would bring her a teacher's pay. Caimi told Frederick that Johnson needed to know that this was not necessarily true; Caimi evidently wanted to make sure that "no one was deluded into thinking" that the ISD was going to agree to pay Johnson the same salary as a teacher. Caimi also said that "if it became an issue," the ISD might have to terminate Johnson's position and contract for services with a local hospital. Caimi asked Frederick to meet with Johnson to convey this information. According to Caimi and Frederick, there was no discussion between them about Caimi's opinion of unions.

In late May 1997, Frederick approached Kenneth Adams, who was then the president of the union. According to Adams, Frederick told him that Caimi said that if Johnson's position were included in the bargaining unit, it would be "jobbed out" and that Johnson would be laid off. However, Frederick said, she told Adams that if Johnson were successful in her attempt to be admitted to the union and receive a teacher's pay, her wage would be out of the range for registered nurses in the county and she might "place herself out of a position."

On the same day, Frederick also spoke directly with Johnson. According to Johnson, Frederick said that if Johnson continued to "pursue union membership" there was a possibility that she would be released and replaced. Johnson also claimed that Frederick stated that Caimi detested unions and that there was "no way in hell that he was going to allow one more member into the union." Frederick, however, said that she told Johnson

> that if she thought union membership would bring her teachers' pay, that this was a misperception and that her pay would be out of line with what other nurses make in the county and we couldn't justify that sort of position for that pay and may need to terminate the position and contract it out.

Frederick denied saying anything to Johnson about Caimi's opinion of unions.

The union and the ISD finally agreed to a new contract that did not cover Johnson or her position. The union subsequently brought an unfair labor practice charge against the ISD, alleging that the ISD violated subsection 10(1)(a) of the public employment relations act (PERA)[1] by telling Johnson that she would lose her job if she joined the union. Subsection 10(1)(a) of the PERA makes it "unlawful for a public employer or an officer or agent of a public employer . . . to interfere with, restrain or coerce public employees in the exercise of their rights guaranteed in section 9." In turn, § 9 of the PERA[2] states:

---

[1] MCL 423.210(1)(a).

[2] MCL 423.209.

> It shall be lawful for public employees to organize together or to form, join or assist in labor organizations, to engage in lawful concerted activities for the purpose of collective negotiation or bargaining or other mutual aid and protection, or to negotiate or bargain collectively with their public employers through representatives of their own free choice.

After a hearing, the MERC hearing referee determined that the ISD violated PERA subsection 10(1)(a) by interfering with Johnson's rights to join a union and to seek the union's assistance for a salary increase when Frederick told Johnson that she would lose her job if she joined the union. The hearing referee found that Johnson was engaged in protected activity when she sought to become a member of the bargaining unit and when she sought the union's assistance in obtaining a wage increase. The hearing referee did not give credit to Johnson's version of the conversation about Caimi's negative view of unions, but concluded that, even if Frederick's testimony regarding her conversation with Johnson were believable, her statements to Johnson constituted "an unlawful threat." The hearing referee then commented:

> The threat to terminate Johnson's position was clearly conveyed. Although the threat to eliminate Johnson's position is tied to her receiving teachers' pay, not to her becoming part of the bargaining unit, Frederick made no effort to distinguish the two. The message which Caimi wanted Frederick to convey, and the message which apparently got through to both Johnson and Adams, was the same: stop pushing the issue of Johnson's inclusion in the unit/salary increase, or Johnson will end up without a job.

The hearing referee recommended that the ISD be ordered to do the following:

1. Cease and desist from interfering with its employees' exercise of their rights under Section 9 of PERA by threatening to subcontract their positions if they form, join or assist in labor organizations, or engage in lawful concerted activities for the purpose of collective negotiation or bargaining or other mutual aid and protection.

2. Post the attached notice [promising that the ISD will not interfere with employees engaging in protected activities under the PERA or threaten that they will lose their jobs if they join the union] to employees in places on the Respondent's premises where notices are commonly displayed for a period of 30 consecutive days.

In late February 1999, the MERC issued a decision and order adopting the hearing referee's decision and recommended order concerning the ISD's treatment of Johnson, stating:

After carefully reviewing the record as a whole, we find that the totality of the evidence supports the [hearing referee's] conclusion that the statement constituted a threat in violation of Section 10(1)(a) of PERA. The clear import of the statement is that Johnson's position would likely be eliminated if she continued her efforts to become a member of the Union and seek the Union's assistance in obtaining a salary increase. As noted by the [hearing referee], there is no evidence in the record to suggest that the Employer would be forced to terminate Johnson if she were to receive the same salary as a teacher, or that circumstances outside the ISD's control might cause the Employer to eliminate Johnson if her position was in fact included in the unit. See *NLRB v River Togs, Inc*, 382 F2d 198 (CA2, 1967).

### B. THE ACADEMY'S UNFAIR LABOR PRACTICE CHARGE

The union's cross appeal involves the ISD's decisions to form a public school academy for its defunct plastics manufacturing program and to prevent the union

from bargaining on behalf of the employees at that public school academy. The ISD created the plastics program in the 1980s and operated it at its Technical Educational Center (the TEC) until 1992, when the ISD discontinued the program because it could not produce graduates who were sufficiently trained to secure jobs in the industry. In early 1996, representatives of local plastics manufacturing companies approached the ISD about reinstating the program. The representatives informed the ISD that they needed well-trained employees and were willing to commit time and money to work with the ISD to create a program that would achieve this goal. Caimi told the representatives that if they were interested in starting a plastics program, they should consider organizing a public school academy under the relevant part of the Revised School Code.[3]

In March 1996, the representatives from the plastics manufacturers submitted an application to the ISD seeking to establish a public school academy. The representatives and the ISD subsequently drafted a contract[4] to create the Academy for Plastics Manufacturing Technology (the academy). In November 1996, the ISD submitted the contract between the ISD and the academy, along with supporting documentation, to the Michigan Department of Education for approval and authorization of state aid payment.

---

[3] MCL 380.501 *et seq.*

[4] We have been unable to locate the contract in the lower court record. The hearing referee's decision quotes from it extensively and, when not reprinting the text of the contract itself, discusses the contract's substance in great detail. Because the parties have not argued that the hearing referee misquoted or misrepresented the contract's terms and text, we rely on her description of the contract and its policies.

The union, however, objected to the way the con-
tract between the ISD and the academy dealt with per-
sonnel. In terms of hiring personnel, the contract
stated in pertinent part:

> All persons who perform services for the Academy shall
> be "at-will" employees or volunteers of the Academy. The
> District agrees that the Academy may select its personnel
> directly without prior authorization from the District, sub-
> ject to compliance with all applicable federal and Michigan
> rules and regulations, including, without limitation, require-
> ments concerning the recruitment of applicants and the use
> of background and criminal checks. The Academy shall
> inform the District's Superintendent or designee of all per-
> sonnel selected in order that their hiring may be approved
> by the District in accordance with Section 516 of the Act.
> Such approval shall not be unreasonably withheld. It is the
> intent of the parties hereto not to create a joint-employer
> relationship. The Academy may terminate the employment
> of any personnel so long as such employees are not termi-
> nated for constitutionally impermissible reasons or reasons
> prohibited by Applicable Law. All teachers and employees
> required to the certified, authorized or permitted if
> employed in a school district as defined in the Act, shall be
> required to be certified, authorized or permitted by the
> Academy as well, all in compliance with Part 22 of the Act.

According to the referee's findings, the contract
between the ISD and the academy also set forth a vari-
ety of personnel policies for the academy, including:
(1) when the academy makes personnel decisions, it
must comply with all state and federal laws and the
terms of the contract; (2) the academy must make all
employment decisions, including prescribing employ-
ment duties and determining compensation and other
benefits; (3) the academy has the final authority on
all disciplinary matters, but could designate an indi-
vidual or entity to perform the disciplinary functions;

(4) the academy must provide the ISD with a quarterly report detailing its progress, policy development, student attendance and discipline information, and personnel matters; (5) the academy has the authority to design and implement its educational program, curriculum, and content standards consistent with the requirements that apply to area vocational-technical education programs; (6) the academy must adopt and enforce its own attendance policies, which must accommodate the attendance policies of the ISD and its component districts in a manner that permits the local districts to comply with state compulsory attendance laws, including day and hour requirements; (7) the academy must adopt and enforce its own student conduct policies, policies concerning student health and welfare, and policies governing work-based instruction; and (8) the academy has the authority to discipline students, but the academy board must make any disciplinary decision involving a suspension of ten or more days.

Subsection 7(e) of the contract stated in part:

> The Academy shall be responsible for its own operations within the limitations of any funding provided through the District as fiscal agent to the Academy and other revenues derived by the Academy consistent with law, and shall have authority to independently exercise, also consistent with applicable law, the following powers: contract for goods and services; prepare a budget; select and direct personnel, evaluate their performance and determine their compensation and continued employment; procure insurance; own or lease facilities for school purposes; purchase, lease or rent furniture, equipment and supplies; and accept and expend gifts, donations or grants of any kind in accordance with such conditions prescribed by the donor as are consistent with law and all other powers provided by law, not contrary to any of the terms of this Contract. The District shall be

given written notice of all accepted gifts, donations and grants, and any condition thereof, within ten (10) business days of receipt.

As the hearing referee explained:

> As provided by statute,[5] the ISD is the fiscal agent for the Academy and has general oversight of the Academy's fiscal status. The academy must submit to the ISD a copy of its annual budget and a monthly revenue and expenditure report. The Academy receives state aid calculated on a per pupil basis, and has also obtained grants. The Academy pays the ISD for a variety of business and administrative services the ISD provides to it. The ISD also pays the Academy for "educational services," i.e., plastic manufacturing and metal machining instruction provided to students of the ISD.

The initial board of trustees of the academy consisted of five representatives from different local plastics manufacturing companies, including three chief operating officers. Under the articles of incorporation, the ISD could increase the number of trustees to a maximum of nine individuals. The articles of incorporation required the academy to submit a list of nominees for a trustee position to the ISD, the district then had the task of appointing the new trustee from that list. Either the board of the ISD or the board of the academy could remove a trustee by a two-thirds vote.

In late 1996, the academy began its operations at the TEC facility with one instructor and six students. Pursuant to the contract between the academy and the ISD, the academy hired the instructor, who did not become part of the union's bargaining unit. Under the service contract attached to the main contract, the ISD provided the academy with a range of services and

---

[5] Part 6A of the Revised School Code, MCL 380.501 et seq.

the academy reimbursed the ISD for those services. Fred Stanley oversaw operations at the academy and also became its director.

In early 1997, the ISD offered to transfer its existing metal machine tool program to the academy. The ISD told the academy that the academy would continue to control its own membership, set policy, and hire and direct its own staff. The academy accepted the proposal. Accordingly, the ISD and the academy amended the existing contract to include the metal machine tool program.

In late May 1997, during negotiations for a new collective bargaining agreement, the union proposed that the ISD include "teachers employed by another district" in the bargaining unit. The ISD rejected the proposal, and it was not included in the new collective bargaining agreement.

In mid-June 1997, the academy posted a vacancy notice for a new metal machine instructor position. The ISD fired the instructor it had hired and the academy hired him. In late July 1997, the union wrote Caimi:

> The [union] hereby demands to bargain over the [ISD's] status as a joint employer with the Academy . . . . Based upon our investigation of documents which we gathered through the Freedom of Information Act requests to the ISD and Academy, as well as the recent job posting of the Metal Machining Instructor at the Academy, it is our belief that the ISD and Academy are operating as joint employers . . . .

Caimi responded to the letter in mid-August 1997, rejecting the union's claim that the ISD and the academy jointly employed the academy's employees. According to Caimi, therefore, the ISD was not required to bargain with the union over the terms

and conditions of employment of the academy's employees.

The union filed its unfair labor practices charge in late August 1997. It contended that the ISD and the academy were joint employers or that the academy was an alter ego of the ISD. Consequently, according to the union, their unilateral removal of the metal machine instructor position from the union's bargaining unit violated PERA subsection 10(1)(e),[6] which states in pertinent part that it is "unlawful for a public employer or an officer or agent of a public employer . . . to refuse to bargain collectively with the representatives of its public employees . . . ."

In late September 1998, the hearing referee issued a decision and recommended order, finding that the ISD and the academy did not violate PERA subsection 10(1)(e) by refusing to bargain with the union over the metal machine instructor position at the academy. The referee explained that the ISD and the academy were not required to bargain with the union over that position. Underlying this conclusion was the hearing referee's determination that the ISD and the academy did not jointly employ the academy's employees because the ISD did not have sufficient independent control over them. Because she concluded that they were not joint employers, the referee recommended dismissing the union's petition for unit clarification.

In the same order and decision that addressed Johnson's unfair labor practice charge, the MERC also considered the hearing referee's findings and conclusions concerning the union's claim that because the ISD and the academy jointly employed the academy's

---

[6] MCL 423.210(1)(e).

employees, the academy engaged in unfair labor practices by excluding the metal machine instructor position from collective bargaining:

> [T]he [hearing referee's] conclusion that the ISD and the Academy are separate employers was based primarily on her finding that the school district did not have sufficient independent control over the employment relationship so that it should be represented at the bargaining table when an agreement is made with regard to the wages, hours and working conditions of the Academy employees. In so holding the [hearing referee] properly applied the definition of "employer" under PERA as set forth in *Wayne Co Civil Service Comm'n v Wayne Co Bd of Supervisors*, 22 Mich App 287 (1970), rev'd in part on other grounds 384 Mich 363 (1971). In that case, the Court held that under PERA the term "employer" means an entity that has the power and responsibility to (1) select and engage the employee, (2) pay the wages, (3) dismiss an employee, and (4) control the employee's conduct, including the method by which the employee carries out his or her work. *Id.* at 294. See also *St Clair Co Prosecutor v AFSCME*, 425 Mich 204, 288 (1986); *City of Grand Rapids*, 1997 MERC Lab Op 358, 364. We agree with the [hearing referee] that the oversight responsibilities of the ISD do not constitute sufficient independent control over the terms of the employment relationship between the Academy and its employees to support a finding that Respondents are joint employers under the Act.

The MERC denied the union's motion to reopen the record to introduce evidence that the ISD moved the electromechanic/hydraulic program to the academy in August 1998. The MERC reasoned that evidence of this allegation would be insufficient to establish that the ISD and the academy were joint employers of the academy's employees. Thus, the MERC adopted the referee's decision and proposed order concerning the academy.

## II. ARGUMENTS ON APPEAL

The ISD now argues that the MERC erred in determining that it violated PERA subsection 10(1)(a) by interfering with Johnson's rights to join the union and to seek union assistance for a salary increase. The union, in turn, argues that the MERC erred in determining that the ISD and the academy did not violate PERA subsection 10(1)(e) by refusing to bargain with the union over the metal machine instructor position. Central to the union's argument on this point is its claim that the ISD and the academy were required to bargain over that position because they jointly employed the academy's employees. Further, the union claims that the MERC erred in denying its request to reopen the proofs so that it could submit new evidence related to this unfair labor practice charge.

## III. STANDARD OF REVIEW

We review MERC decisions " 'pursuant to Const 1963, art 6, § 28, and MCL 423.216(e).' "[7] The MERC's factual findings are " 'conclusive if they are supported by competent, material, and substantial evidence on the record considered as a whole.' "[8] This evidentiary standard is equal to "the amount of evidence that a reasonable mind would accept as sufficient to support a conclusion. While it consists of more than a scintilla of evidence, it may be substantially less than

---

[7] *Police Officers Ass'n of Michigan v Fraternal Order of Police, Montcalm Co Lodge No 149*, 235 Mich App 580, 586; 599 NW2d 504 (1999), quoting *Grandville Municipal Executive Ass'n v City of Grandville*, 453 Mich 428, 436; 553 NW2d 917 (1996).

[8] *Id.*

a preponderance."[9] The MERC's legal conclusions may not be overturned unless they violate the constitution, a statute, or are grounded in " 'a substantial and material error of law.' "[10] In contrast to the MERC's factual findings, its legal rulings "are afforded a lesser degree of deference"[11] because review of legal questions remains de novo, even in MERC cases.[12]

### IV. THE PERA SUBSECTION 10(1)(A) VIOLATION

We agree with the hearing referee and the MERC that the ISD interfered with Johnson's right to join a union. Frederick did not expressly state that the ISD would discharge Johnson if she joined the union. Yet Fredrick's meaning was clear. As the hearing referee put it, Frederick conveyed to Johnson that either she could stop her effort to join the bargaining unit and to increase her salary, or she could lose her job. Further, Frederick made no effort to distinguish, as the ISD apparently would have us do, between the threat to eliminate Johnson's position if she sought teacher's pay and the threat to eliminate Johnson's position if she continued to seek to be included within the bargaining unit. That there was a threat cannot be doubted and we agree with the hearing referee and the MERC that, interpreted reasonably, this threat related to Johnson's desire to have the union represent her. There was competent, material, and substantial evidence on the whole record to support the con-

---

[9] *In re Payne*, 444 Mich 679, 692; 514 NW2d 121 (1994).

[10] *Police Officers*, *supra* at 586, quoting *Grandville*, *supra* at 436.

[11] *Grand Rapids Employees Independent Union v Grand Rapids*, 235 Mich App 398, 403; 597 NW2d 284 (1999).

[12] See *Kent Co Deputy Sheriff's Ass'n v Kent Co Sheriff*, 463 Mich 353, 357, n 8; 616 NW2d 677 (2000).

clusions of the hearing referee and the MERC that this conduct violated PERA subsection 10(1)(a) because it was an attempt to coerce Johnson while she was engaged in the exercise of her rights guaranteed in § 9 of the PERA.

The history of labor relations in this country illustrates that workers and union advocates have had to fight, and often fight hard, merely for the right to form labor organizations and to bargain collectively with their employers through representatives of their own choosing. We must remember, as one commentator observed, that "labor began as a criminal conspiracy."[13] However, the Norris-LaGuardia Act,[14] the National Labor Relations Act[15] and, in Michigan, the labor mediation act[16] and the PERA[17] guaranteed the right to form labor associations and to engage in collective bargaining. Now, to most, these rights are as familiar as the constitutional guarantees of freedom of speech and freedom of the press.[18] However, the road from criminal conspiracy to familiar cultural institution has often been a rocky one. More often than some may care to recognize, those who have sought to exercise their statutory rights to organize have faced opposition—ranging from mild intimidation to the most direct forms of outright coercion—when attempting to do so.[19] While this case may not

[13] See Geoghegan, *Which Side Are You On?* (New York: Farrar, Straus & Giroux, 1991), p 6.

[14] 29 USC 101 *et seq.*

[15] 29 USC 151 *et seq.*

[16] MCL 423.1 *et seq.*

[17] MCL 423.201 *et seq.*

[18] See US Const, Am I.

[19] See, generally, *General Teamsters Union, Local No 406 v Uptown Cleaners & Hatters, Inc,* 356 Mich 204; 97 NW2d 593 (1959).

present the most egregious form of such coercion, it nevertheless demonstrates how vigilant the law must be.

### V. THE ALLEGED PERA SUBSECTION 10(1)(E) VIOLATION

#### A. THE JOINT-EMPLOYER DOCTRINE

The joint-employer doctrine is used to enforce a labor agreement entered into through collective bargaining against a party that did not sign the agreement.[20] In effect, the doctrine deems the party that did not sign the agreement as the employer under the agreement by examining whether that party has the characteristics of an employer. Those characteristics include (1) the power to select and hire employees, (2) the payment of wages, (3) the authority to dismiss employees, and (4) power and control over employees' conduct.[21]

#### B. ULTIMATE AUTHORITY

We conclude that the MERC correctly determined that the ISD and the academy did not violate PERA subsection 10(1)(e) by refusing to bargain with the union concerning the metal machine instructor position

---

[20] See, generally, *American Federation of State, Co & Municipal Employees v Dep't of Mental Health*, 215 Mich App 1, 3; 545 NW2d 363 (1996); see also *St Clair Prosecutor v American Federation of State, Co & Municipal Employees, AFL-CIO, St Clair Co General Employees Chapter, Local 1518*, 425 Mich 204, 224, n 2; 388 NW2d 231 (1986); *Ottawa Co v Jaklinski*, 423 Mich 1, 13; 377 NW2d 668 (1985).

[21] *Michigan Council 25, American Federation of State, Co & Municipal Employees, AFL-CIO v St Clair Co*, 136 Mich App 721, 736; 357 NW2d 750 (1984), rev'd in part on other grounds 425 Mich 204, 233; 388 NW2d 231 (1986), citing *Wayne Co Civil Service Comm v Wayne Co Bd of Supervisors*, 22 Mich App 287, 294; 177 NW2d 449 (1970), rev'd in part on other grounds 384 Mich 363; 184 NW2d 201 (1971).

because the ISD and the academy did not jointly employ the academy's employees. Under the relevant part of the Revised School Code[22] and the contract between the ISD and the academy, the academy had the ultimate authority to hire, fire, and discipline its employees. The academy also determined the wages, benefits, and work schedule of its employees. The ISD, on the other hand, certainly had extensive oversight responsibilities required by law.[23] However, the ISD did not exercise independent control over the academy's employees on a daily basis and to such a pervasive extent that it could reasonably be considered their employer, whether independent of or jointly with the academy. The MERC therefore did not err in dismissing the union's claim that the ISD unlawfully refused to bargain with regard to the academy's employees.[24] Moreover, because the ISD did not employ the academy's instructional staff, the MERC also correctly dismissed the union's petition for unit clarification.

### C. THE PERA'S SUPREMACY

The union also claims that the ISD and the academy should be considered joint employers of the academy's employees because PERA § 9 is the Legislature's

---

[22] MCL 380.501 et seq.

[23] See MCL 380.502(4), 380.503(5).

[24] Like the hearing referee, we also note that the Revised School Code does not use the terms "intermediate school district" and "school district" interchangeably. See MCL 380.4(4) (" 'Intermediate school district' means a corporate body established under part 7," referring to MCL 380.601 et seq.), MCL 380.6(1) (" 'School district' . . . means a general powers school district organized under this act, regardless of previous classification, or a school district of the first class."). As a result, the requirement that a public school academy's employees be covered under the authorizing "school district's" collective bargaining agreement does not apply in this case. See MCL 380.502(3)(i), 380.503(5)(e).

primary vehicle for defining employees' rights to organize. The union argues that the public school academies legislation in the Revised School Code[25] conflicts with the PERA. The union contends that if the ISD and the academy are not considered joint employers, then the ISD will be allowed to escape its obligation to bargain with unions simply by transferring all its assets, programs, and staff to the academy while still maintaining the control it would exercise had the assets, programs, and staff remained within the ISD. This, the union argues, would defeat the PERA's purposes of allowing unions to exist and barring employers from impeding employees' efforts to take part in union activities.

The case law that the union cites for the proposition that the PERA contains a legislative endorsement of the right to unionize is plentiful. In *Detroit Bd of Ed v Parks*,[26] the Supreme Court required a provision of the teacher tenure act[27] that conflicted with the PERA to cede to the PERA. As the Supreme Court noted:

> "This Court has consistently construed the PERA as the dominant law regulating public employee labor relations." *Rockwell v Crestwood School Dist* [393 Mich 616, 629; 227 NW2d 736 (1975)]. See, also, *Local 1383, International Ass'n of Fire Fighters, AFL-CIO v City of Warren*, 411 Mich 642; 311 NW2d 702 (1981); *Central Michigan University Faculty Ass'n v Central Michigan University*, 404 Mich 268; 273 NW2d 21 (1978). When there is a conflict between

[25] MCL 380.501 *et seq.*

[26] *Detroit Bd of Ed v Parks*, 417 Mich 268, 280-283; 335 NW2d 641 (1983).

[27] MCL 38.101.

PERA and another statute, PERA prevails, diminishing the conflicting statute *pro tanto*.[28]

There are, however, two problems with the union's argument.

First, unlike the irreconcilable conflict between the language in the PERA and the teacher tenure act addressed in *Detroit Bd of Ed*, here the union has not pointed to any explicit provision in the Revised School Code that allegedly conflicts with the PERA. Identifying conflicting legislative provisions is a critical analytical step. This is so because an appellate court's first duty is to harmonize, if possible, apparently conflicting legislative enactments in order to carry out the Legislature's intent to the fullest extent possible.[29] We agree with the union that nothing in subsection 502(3)(i) of the Revised School Code would prevent the joint-employer doctrine from applying in this case, largely because subsection 502(3)(i) concerns traditional public schools, not intermediate school districts. However, we cannot agree with the union that there is a conflict between the Revised School Code and the PERA because, even with this citation of subsection 502(3)(i), we do not know the precise nature of this alleged statutory conflict.

The second problem with the union's argument is that it fails to recognize that, even with the supervisory role the ISD retains over the academy, it never-

---

[28] *Detroit Bd of Ed, supra* at 280; see also *Irons v 61st Judicial Dist Court Employees Chapter of Local No 1645*, 139 Mich App 313, 320-321; 362 NW2d 262 (1984).

[29] See *People v Schneider*, 119 Mich App 480, 485-486; 326 NW2d 416 (1982); see also *Grievance Administrator v Deutch*, 455 Mich 149, 175, n 2; 565 NW2d 369 (1997) (MALLETT, C.J., dissenting).

theless gave up a significant amount of control and authority by transferring the metal machine program. When considering the ISD's relationship with the academy as a whole, this loss of authority may not be exactly proportionate to the assets and staff transferred to the academy. However, it is enough to conclude that the academy is not merely the ISD's alter ego or a sham entity. As the referee noted, manufacturers, not the ISD, initially developed the idea of a public school academy that would teach metal machining to meet industry needs. As far as we can tell from the record, while the ISD may have been pleased with the effect that forming the academy had on its dealings with the union, the ISD did not take advantage of this situation in order to avoid its obligation to negotiate with unions under the PERA.

### D. REOPENING THE RECORD

The union also argues that the MERC erred in denying its motion to reopen the record to introduce evidence that the ISD moved its electromechanic/hydraulics program to the academy in August 1998. To merit reopening the record, the union had to demonstrate that it "could not with reasonable diligence have discovered and produced the evidence at the original hearing" and that "the evidence sought to be introduced, and not merely its materiality, is newly discovered."[30] While this is a foundational requirement for reopening

---

[30] See *Schoolcraft College Ass'n of Office Personnel, MESPA v Schoolcraft Community College*, 156 Mich App 754, 762; 401 NW2d 915 (1986); see also 1979 AC, R 423.468(2) ("The commission may reopen a record in any case and receive further evidence, may close the case upon compliance with the administrative law judge's recommended order, or may make other disposition of the case.").

the record, the case law on this point nevertheless makes it clear that reopening the record is discretionary, by saying that the record "may" be reopened with this proof.[31] Though the union had not been able to present this evidence any earlier because the second program transfer did not occur until after the hearing referee issued her decision and recommended order, the MERC did not abuse its discretion in denying the request. This evidence would not be enough to prove that the ISD and the academy were joint employers and, in turn, have any effect on the administrative proceedings.

Affirmed.

COLLINS, J., concurred.

M. J. KELLY, P.J., did not participate.

---

[31] *Schoolcraft College, supra* at 762; see, generally, *Omne Financial, Inc v Shacks, Inc,* 460 Mich 305, 318; 596 NW2d 591 (1999) ("The . . . use of the word 'shall' rather than 'may' . . . indicates a mandatory, rather than discretionary, action.").