# STATE OF MICHIGAN

# COURT OF APPEALS

DECATUR PUBLIC SCHOOLS,

FOR PUBLICATION
March 17, 2015
9:15 a.m.

Respondent-Appellee,

v

VAN BUREN COUNTY EDUCATION
ASSOCIATION and DECATUR
EDUCATIONAL SUPPORT PERSONNEL
ASSOCIATION,

Charging Parties-Appellant.

No. 320272
MERC
LC Nos. 00-000123; 00-000124

Before: JANSEN, P.J., and METER and BECKERING, JJ.

PER CURIAM.

Charging parties, Van Buren County Education Association and Decatur Educational Support Personnel Association, appeal as of right the January 21, 2014 decision of the Michigan Employment Relations Commission ("MERC") dismissing two unfair labor practice ("ULP") charges against respondent, Decatur Public Schools. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

### A. PA 152

The facts in this case are largely undisputed and involve Van Buren County Education Association ("VBCEA"), which is a bargaining unit for teachers in Van Buren County, Decatur Educational Support Personnel Association ("DESPA"), a bargaining unit for support personnel, and the Decatur Public Schools. This case involves a public employer's contributions to its employees' health insurance costs, and whether the employer has a duty to bargain with regard to limits imposed on its contributions to employees' health care costs under 2011 PA 152, MCL 15.561 *et seq.*,[1] the "Publicly Funded Health Insurance Contribution Act." PA 152 was given

---

[1] The Legislature has since amended the act; some of the amendments were curative and intended to operate retroactively. Unless otherwise indicated, all references to the statute are as it appeared in 2011 PA 152, or as it was retroactively modified by the Legislature. None of the amendments, curative or otherwise, are pertinent to the issues raised in this appeal.

-1-

effect on September 27, 2011 and provides limits on the maximum amount that a public employer can contribute to medical benefit plans for its employees or elected public officials. Among other matters, PA 152 provided what the parties term "hard caps" for contributions to medical benefit plans for its employees. Section 3 of the act provides in relevant part:

> Except as otherwise provided in this act, a public employer that offers or contributes to a medical benefit plan for its employees or elected public officials shall pay no more than the annual costs or illustrative rate and any payments for reimbursement of co-pays, deductibles, or payments into health savings accounts, flexible spending accounts, or similar accounts used for health care costs, than a total amount equal to $5,500.00 times the number of employees and elected public officials with single-person coverage, $11,000.00 times the number of employees and elected public officials with individual-and-spouse coverage or individual-plus-1-nonspouse-dependent coverage, plus $15,000.00 times the number of employees and elected public officials with family coverage, for a medical benefit plan coverage year beginning on or after January 1, 2012. [MCL 15.563(1).]

In addition to the hard caps option set forth in section 3, a public employer, excluding the state, could elect to comply, "[b]y majority vote of its governing body" with section 4 of PA 152. The option provided in section 4 provided that a public employer "shall pay not more than 80% of the total annual costs of all of the medical benefit plans it offers or contributes to for its employees and elected public officials." MCL 15.564(2). Thus, subject to certain exemptions set forth in section 8 that are not applicable in the instant matter, PA 152 gave a public employer two options for contributing to the cost of medical benefit plans for its employees.

In enacting PA 152, the Legislature recognized that medical benefit plans may have been subject to existing collective bargaining agreements ("CBA"), and grandfathered in a public employer's contributions to medical benefit plans under existing CBAs; nonetheless, PA 152 mandated compliance with the act upon expiration of the previous of the CBAs. In this regard, section 5 of PA 152 provided:

> (1) If a collective bargaining agreement or other contract that is inconsistent with sections 3 and 4 is in effect for 1 or more employees of a public employer on September 27, 2011, *the requirements of section 3 or 4 do not apply to an employee covered by that contract until the contract expires.* A public employer's expenditures for medical benefit plans under a collective bargaining agreement or other contract described in this subsection shall be excluded from calculation of the public employer's maximum payment under section 4. *The requirements of sections 3 and 4 apply to any extension or renewal of the contract.*

> (2) A collective bargaining agreement or other contract that is executed on or after September 27, 2011 shall not include terms that are inconsistent with the requirements of sections 3 and 4. [MCL 15.565 (emphasis added).]

Section 9 of the act contained a penalty for failure to apply with the contributions limit:

If a public employer fails to comply with this act, the public employer shall permit the state treasurer to reduce by 10% each economic vitality incentive program payment received under 2011 PA 63 and the department of education shall assess the public employer a penalty equal to 10% of each payment of any funds for which the public employer qualifies under the state school aid act of 1979, 1979 PA 94, MCL 388.1601 to 388.1772, during the period that the public employer fails to comply with this act. Any reduction setoff or penalty amounts recovered shall be returned to the fund from which the reduction is assessed or upon which the penalty is determined. The department of education may also refer the penalty collection to the department of treasury for collection consistent with section 13 of 1941 PA 122, MCL 205.13. [MCL 15.569.]

### B. UNFAIR LABOR PRACTICE CHARGE BY VBCEA

Charging party VBCEA and respondent are parties to a CBA that became effective on July 1, 2011, expiring on June 30, 2012. On or about May 14, 2012, before the first bargaining session on the new CBA, superintendent Elizabeth Godwin sent a memorandum to VBCEA members regarding their insurance premiums for the upcoming school year. The memorandum indicated that effective July 1, 2012, the day after the current CBA expired, respondent intended to implement a hard cap[2] on its contributions as set forth in PA 152. Godwin also sent letters to VBCEA members regarding the deductions that would be taken from their last paychecks in June 2012 that would be necessary to cover those members' increased health care contributions.

On or about May 22, 2012, respondent and VBCEA held their first bargaining session for the new CBA. According to Godwin's affidavit, which charging parties did not refute, respondent and VBCEA began to negotiate at this session concerning, among other matters, the hard cap option chosen by respondent. Although the parties met and bargained, they did not reach an agreement, and respondent proceeded with implementing the hard caps on health care costs.

On June 29, 2012, VBCEA filed a ULP charge against respondent, alleging that health insurance benefits were a mandatory subject of collective bargaining under the Public Employee Relations Act ("PERA"), MCL 423.215. VBCEA also alleged that respondent had a duty to maintain the terms and conditions of the existing CBA until the parties either reached a successor agreement or impasse.

VBCEA contended that respondent implemented the hard cap with no meaningful bargaining, in violation of PERA. VBCEA requested that respondent be found in violation of PERA for refusing to bargain and that insurance coverage contributions amounts be returned to the amounts that existed under the now-expired CBA until the parties reached either a successor agreement or impasse.

---

[2] "Hard cap" refers to the limits set forth in MCL 15.563.

-3-

## C. UNFAIR LABOR PRACTICE CHARGE BY DESPA

Respondent and charging party DESPA are parties to a collective bargaining agreement that took effect on November 14, 2011, expiring on June 30, 2012. In May 2012, respondent, just as it had done with VBCEA, sent notices to DESPA members regarding increased insurance costs associated with its decision to implement the hard cap set forth in PA 152. At that time, respondent and DESPA had not yet scheduled their first bargaining session for a new CBA, nor had DESPA requested bargaining.

In response to the memoranda indicating respondent's choice of the hard caps and increased deductions associated therewith, DESPA filed a ULP charge against respondent that was virtually identical to the ULP filed against VBCEA.

## D. AGENCY PROCEEDINGS

On December 20, 2012, the parties presented arguments to an administrative law judge, who issued a decision and recommended order dismissing the ULP charges. Recognizing that there is a mandatory duty to bargain over health insurance benefits under PERA, the ALJ agreed with charging parties' contentions that there was a duty to bargain over the employer's choice of implementing the hard caps in MCL 15.563 or the 80% contribution plan ("80/20 plan") in MCL 15.564, but nevertheless found that respondent did not violate its duty to bargain in this case. First, as to DESPA, the ALJ found, based on unrebutted evidence, that DESPA never requested bargaining; therefore, respondent could not have violated a duty to bargain with regard to DESPA. Second, as to VBCEA, which requested bargaining, the ALJ found that the expiration of an existing CBA amounted to "statutorily imposed impasse" under PA 152, which permitted respondent to take unilateral action in implementing the hard caps plan. Therefore, respondent's actions were permitted under PERA, and there was no merit to VBCEA's charge.

Charging parties and respondent filed exceptions to the ALJ's findings, and the matter was reviewed by MERC. On January 21, 2014, MERC issued a decision and order in which it dismissed the ULP charges filed by charging parties. Turning first to the ULP filed by DESPA, MERC found that, regardless of whether there was a duty to bargain over the implementation of hard caps or the 80/20 plan, the charge was without merit. In so finding, MERC noted that DESPA did not assert that it demanded bargaining, nor did the record contain any such demand. Even assuming a duty to bargain, there was, reasoned MERC, no requirement for the employer to initiate bargaining; instead, an employer's duty to bargain under PERA is conditioned upon there being a demand for bargaining by the union.

Next, turning to the charge filed by VBCEA, MERC found that there was no conflict between PA 152 and PERA's bargaining mandates, and concluded that there was no duty to bargain on the employer's choice between the hard caps and the 80/20 plan. It also rejected charging parties' contention that respondent was not required to implement PA 152's mandates immediately upon the expiration of an existing CBA. It is from this decision and order that charging parties now appeal as of right.

## II.  STANDARD OF REVIEW

"The MERC is the sole state agency charged with the interpretation and enforcement of this highly specialized and politically sensitive field" of public sector labor law.  *Kent Co Deputy Sheriffs' Ass'n v Kent Co Sheriff*, 238 Mich App 310, 313; 605 NW2d 363 (1999), aff'd in part 463 Mich 353 (2000).

> We review MERC decisions pursuant to Const 1963, art 6, § 28, and MCL 423.216(e).  MERC's findings of fact are conclusive if they are supported by competent, material, and substantial evidence on the record considered as a whole.  MERC's legal determinations may not be disturbed unless they violate a constitutional or statutory provision or they are based on a substantial and material error of law.  In contrast to [ ] MERC's factual findings, its legal rulings are afforded a lesser degree of deference because review of legal questions remains de novo, even in MERC cases."  [*Branch Co Bd of Comm'rs v Int'l Union, United Auto, Aerospace & Agricultural Implement Workers of America, UAW*, 260 Mich App 189, 192-193; 677 NW2d 333 (2003) (internal citations and quotation marks omitted).]

Resolution of the issues raised in this case involve statutory interpretation, which this Court ordinarily reviews de novo.  *Krohn v Home-Owners Ins Co*, 490 Mich 145, 155; 802 NW2d 281 (2011).  While review is de novo, appellate courts give respectful consideration to MERC's legal conclusions.  *In re Complaint of Rovas Against SBC Michigan*, 482 Mich 90, 97, 103; 754 NW2d 259 (2008); *Detroit Pub Sch v Conn*, __ Mich App __; __ NW2d __ (Docket Nos. 317007; 317050, issued November 25, 2014), slip op at 8-9.  However, the agency's interpretation is not binding on this Court, and the agency's interpretation "cannot conflict with the Legislature's intent as expressed in the language of the statute at issue."  *In re Complaint of Rovas*, 482 Mich at 103.

## III.  ANALYSIS

We are first asked to consider whether PERA and PA 152 conflict and whether there is a duty for an employer to bargain over the decision to implement hard caps or the 80/20 plan.  In making this determination, we recognize that "an appellate court's first duty is to harmonize, if possible, apparent conflicting legislative enactments in order to carry out the Legislature's intent to the fullest extent possible."  *St Clair Co Intermediate Sch Dist v St Clair Co Ed Ass'n*, 245 Mich App 498, 518; 630 NW2d 909 (2001).

### A.  PERA

"The PERA governs the relationship between public employees and governmental agencies."  *Macomb Co v AFSCME Council 25*, 494 Mich 65, 77-78; 833 NW2d 225 (2013).  "PERA drastically altered public employee labor relations in Michigan.  It represents the Legislature's intent to assure[ ] public employees of protection against unfair labor practices, and of remedial access to a state-level administrative agency with special expertise in statutory unfair labor practice matters."  *Id.* (citations and quotation marks omitted).  In the past, this Court and our Supreme Court have held that the provisions of PERA take precedence over other conflicting

laws "to ensure uniformity, consistency, and predictability in the critically important and complex field of public sector labor law." *Kent Co Deputy Sheriffs' Ass'n*, 238 Mich App at 313. See also *Rockwell v Crestwood Sch Dist Bd of Ed*, 393 Mich 616, 630; 227 NW2d 736 (1975) (explaining that "[t]he Supremacy of the provisions of the PERA is predicated on the constitution . . . and the apparent legislative intent that the PERA be the governing law for public employee labor relations.").

Pertinent to the case at bar, PERA imposes upon public employers a duty to bargain collectively with the representatives of its employees "in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." MCL 423.215(1). See also *AFSCME Local 25 v Wayne Co*, 297 Mich App 489, 494; 824 NW2d 271 (2012) (explaining that PERA imposes a duty to bargain collectively upon the expiration of a CBA). Wages, hours, and other conditions of employment, including health insurance benefits, are mandatory subjects of bargaining. *Ranta*, 271 Mich App at 270. While a public employer has a duty to bargain, that duty is not implicated absent a request by the employer to enter into negotiations. *St Clair Prosecutor v AFSCME, Local 1518*, 425 Mich 204, 242; 388 NW2d 231 (1986). Thus, an employer's duty to bargain is "expressly condition[ed]" "on there being a request for bargaining from the employees." *Local 586 Serv Employees Int'l Union v Village of Union City*, 135 Mich App 553, 557; 355 NW2d 275 (1984).

## B. CLAIM OF DESPA

As an initial matter, because the duty to bargain is "expressly conditioned" on a request for bargaining from the employees, we find that, even assuming a duty to bargain over the choice between the hard caps and the 80/20 plan, DESPA's claim is meritless as it is undisputed that DESPA never requested bargaining in this case. See *Local 586 Serv Employees Int'l Union*, 135 Mich App at 557. Charging parties do not even challenge this portion of MERC's decision.

## C. PA 152

Next, in order to evaluate the issue briefed by charging parties as it relates to VBCEA, we turn to PA 152. PA 152 exclusively concerns health insurance benefits and provides, for purposes of this case, two different means for capping an employer's contributions to its employees' health insurance benefits. The first, set forth in MCL 15.563, establishes the hard caps option. In MCL 15.564, the Legislature provided a second option for a public employer's contributions to its employees' health care benefits. As was in effect at the time of charging parties' ULP charge, that option provided:

> (1) By a majority vote of its governing body, a public employer, excluding this state, may elect to comply with this section for a medical benefit plan coverage year instead of the requirements in section 3. The designated state official may elect to comply with this section instead of section 3 as to medical benefit plans for state employees and state officers.
>
> (2) For medical benefit plan coverage years beginning on or after January 1, 2012, a public employer shall pay not more than 80% of the total annual costs of all of the medical benefit plans it offers or contributes to for its employees and elected

public officials. For purposes of this subsection, total annual costs includes the premium or illustrative rate of the medical benefit plan and all employer payments for reimbursement of co-pays, deductibles, and payments into health savings accounts, flexible spending accounts, or similar accounts used for health care but does not include beneficiary-paid copayments, coinsurance, deductibles, other out-of-pocket expenses, other service-related fees that are assessed to the coverage beneficiary, or beneficiary payments into health savings accounts, flexible spending accounts, or similar accounts used for health care. Each elected public official who participates in a medical benefit plan offered by a public employer shall be required to pay 20% or more of the total annual costs of that plan. The public employer may allocate the employees' share of total annual costs of the medical benefit plans among the employees of the public employer as it sees fit. [MCL 15.564.]

With a nod toward existing CBAs that were not in compliance with the limitations imposed in sections 3 and 4, MCL 15.656(5) clarified that the requirements contained in the statute only applied to new CBAs, not existing CBAs:

(1) If a collective bargaining agreement or other contract that is inconsistent with sections 3 and 4 is in effect for 1 or more employees of a public employer on September 27, 2011, the requirements of section 3 or 4 do not apply to an employee covered by that contract until the contract expires. A public employer's expenditures for medical benefit plans under a collective bargaining agreement or other contract described in this subsection shall be excluded from calculation of the public employer's maximum payment under section 4. The requirements of sections 3 and 4 apply to any extension or renewal of the contract.

(2) A collective bargaining agreement or other contract that is executed on or after September 27, 2011 shall not include terms that are inconsistent with the requirements of sections 3 and 4.

D. DOES PA 152 CONFLICT WITH PERA, AND IS THERE A DUTY TO BARGAIN?

"The primary goal of statutory interpretation is to ascertain the legislative intent that may reasonably be inferred from the statutory language. The first step in that determination is to review the language of the statute itself." *Krohn*, 490 Mich at 156 (internal citation and quotation marks omitted). Here, both PA 152 and PERA concern, at least to some degree, the subject of health insurance benefits for public employees. This Court should attempt to construe the statutes so as to avoid a conflict. See *St Clair Co Intermediate Sch Dist*, 245 Mich App at 518. As noted, in the past, our Supreme Court has held that when PERA conflicts with another statute, PERA, as the predominant law in the field of public employee relations, prevails. See, e.g., *Rockwell*, 393 Mich at 629-630.

We find that PA 152 and PERA do not conflict, and that there is no duty to bargain over the employer's choice between the hard caps and the 80/20 plan. Initially, the plain language of PA 152 does not give rise to an obligation to bargain with regard to this choice. Notably, MCL 15.563(1) states that a public employer *shall pay no more of the annual costs* than "a total

amount equal to" the hard caps set forth in the statute. The word "shall" is a mandatory directive, indicating that the hard caps option is the default position. See *Smitter v Thornapple Twp*, 494 Mich 121, 136; 833 NW2d 875 (2013) ("The Legislature's use of the word 'shall' generally indicates a mandatory directive, not a discretionary act."). As an alternative to the hard caps, the public employer may, "[b]y majority vote of its governing body" elect to comply with the 80/20 plan. MCL 15.564(1). Nothing in this language gives rise to the idea that there is a duty to bargain with regard to the choice between hard caps and the 80/20 plan. Rather, the choice is left to the "governing body" of the public employer to decide, by majority vote, if it will deviate from the default position of the hard caps. As noted by MERC, this interpretation is buttressed by examination of PA 152's repeated references to "total amounts" of health care contributions and the fact that the limits imposed by the act apply to the "total amounts" of contributions for all of the employer's employees and all bargaining groups. The act does not speak of "total amounts" for each type of plan chosen for each individual bargaining group; rather, the act speaks only of the "total amounts" of contributions for the public employer's "employees." See MCL 15.563-15.564. This supports the interpretation that an employer is to choose one type of plan for all of its employees, not that the employer is to bargain over the choice of plans with each of its labor groups. In other words, the choice of contribution limits for all groups of employees is left solely to the public employer.

Moreover, this result is not in conflict with the collective bargaining mandates of PERA, nor does it remove health insurance benefits from the realm of mandatory bargaining. PERA requires bargaining on certain subjects, including health insurance benefits. PA 152 does not foreclose bargaining on health insurance benefits. Rather, as MERC recognized, PA 152 sets *limits* on the amount of health insurance benefits a public employer can pay. Nothing in the statute prevents bargaining up to the statutorily-imposed limits. Indeed, PA 152 expressly recognizes the right of collective bargaining, as it mandates that the limits not take effect until *after* the expiration of a CBA in the event that the existing CBA contained terms that were inconsistent with the limits prescribed in the statute. See MCL 15.565(1). Employees may still bargain for health insurance benefits up to the amount of the limits imposed by the employer, whether that limit be in the form of the hard caps or the 80/20 plan. For instance, if the employer chooses the hard caps option, different employee bargaining groups can then bargain for the amount that the employer will pay, up to the hard caps. As long as, after negotiations, the employer does not exceed the amounts imposed by the hard caps, the employer remains in compliance with the statute. Examination of the 80/20 plan yields the same result. The 80/20 plan provides that an employer "shall pay not more than 80% of the total annual costs of all of the medical benefits plans it offers or contributes to for its employees and elected public officials." MCL 15.564(2). Again, this gives various employee groups the ability to bargain with regard to the total amount, up to a maximum of 80% of costs, that the employer will contribute to that group's health insurance costs. In sum, the fact that the governing body of the public employer has the discretion to choose the plan that will affect the parameters of bargaining does not conflict with the public employer's obligation to bargain under PERA. See *Detroit Police Officers Ass'n*, 391 Mich 44, 67-68; 214 NW2d 803 (1974) (finding no conflict between PERA and the Home Rule Cities Act by reading the Home Rule Cities Act as empowering a city to set certain procedures for its pension plan and to leave the substantive terms of the plan to collective negotiation).

Furthermore, finding a conflict between the statutes on the issue of a public employer's choice between the hard caps and the 80/20 plan would effectively read into PA 152 language that the Legislature did not see fit to include. MCL 15.564 only states that the "governing body" of a public employer "may elect to comply with this section . . . ." It does not state that a bargaining unit may force the hand of the board to choose the 80/20 plan, or even that a bargaining unit may force the governing body to vote on the choice between the hard caps and the 80/20 plan. Rather, the statute simply states that the governing body "may elect to comply with this section instead of section 3 . . . ." MCL 15.564(1). This Court should not read into MCL 15.564 words not that were not within the intent of the Legislature as derived from the plain language of the statute. See *Mich Ed Ass'n v Secretary of State*, 489 Mich 194, 218; 801 NW2d 35 (2011).

Our conclusion that there is no conflict between PA 152 and PERA is strengthened by comparing the interaction of PA 152 and PERA in the instant case with cases where courts have found conflicts between PA 152 and other statutes. Notably, in *Rockwell*, 393 Mich 616, one of the seminal cases on the supremacy of PERA, there existed a conflict between PERA and the Teachers' Tenure Act ("TTA") that was much more direct and apparent than any alleged conflict in the case at bar. In *Rockwell*, a school board and teachers' union became embattled in a labor dispute that involved strikes. *Id.* at 626. After two strikes, the school board ordered teachers to return to work or submit a letter of resignation; otherwise, their employment would be terminated. *Id.* at 626-627. Scores of teachers neither returned to work nor submitted a letter of resignation, and the school board terminated their positions. *Id.* at 627. Pertinent to that case, PERA enabled public employers to discipline employees for striking, and if the employer disciplined the employee, the employee was entitled, under PERA, to request a determination whether he violated the provisions of PERA; thus, the determination came *after* the discipline. *Id.* at 624. In contrast, the TTA required a hearing *before* discharge, and directed that discharge could only occur for reasonable and just cause, and only after notice and a hearing. *Id.* at 625. The dispute in that case concerned whether the procedures in PERA—determination *after* discipline—or the procedures in the TTA—determination *before* discipline—controlled. *Id.* at 624-625, 628-629. In resolving this issue, our Supreme Court found that the TTA, which was enacted before PERA, could not have been intended to consider labor disputes between school boards and their employees, and that PERA was intended to be the predominant law governing public employee labor relations. *Id.* at 630. Therefore, the Court found that the disciplinary procedures set forth in PERA with regard to teachers who participated in a strike should apply over those set forth in the TTA, as those disciplinary procedures primarily concerned the actions of individual teachers in non-labor related settings. *Id.* at 631-632.

Similarly, in *Detroit Bd of Ed v Parks*, 417 Mich 268, 281; 335 NW2d 641 (1983), our Supreme Court found a conflict between the TTA and PERA and refused to read into CBAs entered into under PERA requirements from the TTA concerning a reasonable and just cause standard for discharge. As a result, the teacher in *Parks* was precluded from invoking procedures under the TTA because PERA, the requirements of which conflicted with the TTA, controlled in that situation. *Id.*

The instant case is distinguishable from *Rockwell* and *Parks*. PA 152 and PERA do not contain conflicting provisions as to collective bargaining rights. Rather, the statutes and their respective mandates can be read to coincide with one another. As noted, PA 152 simply sets

limits an employer may not exceed when paying for health care contributions. The statute gives the employer a choice as to which set of limits—the hard caps or the 80/20 plan—that the employer can implement. After the employer makes that choice, nothing prohibits or prevents collective bargaining on the issue of health insurance contributions. Therefore, PA 152 and PERA can be read so as not to conflict, and can be reconciled with one another. See *Wayne Co Prosecutor v Dep't of Corrections*, 451 Mich 569, 576-577; 548 NW2d 900 (1996) (explaining that, where possible, statutes should be construed to avoid conflict and to avoid a finding of repeal by implication).[3]

## D.  IMPOSITION OF HARD CAPS IMMEDIATELY UPON EXPIRATION OF CBA

Lastly, we address charging parties' contention that respondent was not required to implement its choice of the hard caps option immediately upon the expiration of the parties' existing CBA. Charging parties argue that respondent could have waited, after bargaining, to make its choice, and that it had enough time to ensure that the benefits paid were within either the hard cap or the 80/20 plan. The importance of this issue is largely dependent on whether respondent had a duty to bargain with regard to the choice between the hard caps and the 80/20 plan. With no duty to bargain over the implementation of hard caps or the 80/20 plan, nothing prevented respondent from unilaterally implementing the plan at the date of the expiration of the existing CBA. See *Grand Rapids Community College Faculty Ass'n v Grand Rapids Community College*, 239 Mich App 650, 656-657; 609 NW2d 835 (2000). Moreover, PA 152 is clear that, upon expiration of the existing CBA, a public employer is to comply with the statute. Indeed, the limits imposed by either the hard caps or the 80/20 plan came into play at the expiration of the previous CBA. See MCL 15.565(1) (explaining that, in the event the public employer and its employees were parties to a CBA, the limits imposed on employer health care contributions "do not apply . . . *until* the contract expires). The word "until"[4] means "up to the time that or when[.]" *Random House Webster's College Dictionary* (2005). Thus, a public employer's ability to delay implementation of the limits imposed by PA 152 lasted "up to the time that or when" the CBA expired, but no longer. See MCL 15.565(5). There is no language in the statute explaining that an employer is allowed to delay implementation of the hard caps or the 80/20 plan. And PERA, in MCL 423.215b(1),[5] is clear that the employee is required to bear the

---

[3] Because we find that an employer does not have a duty to bargain over the choice between implementing the hard caps and the 80/20 plan, we find moot charging parties' allegation that the ALJ erred in finding that PA 152 created a "statutorily imposed impasse" upon the expiration of an existing CBA. Indeed, if bargaining is not required, nothing prohibited respondent from taking unilateral action, and whether PA 152 created a statutorily imposed impasse has no bearing on this case. Thus, we do not decide this issue.

[4] A reviewing court may consult dictionaries in order to give words their plain and ordinary meaning. *Krohn*, 490 Mich at 156.

[5] MCL 423.215b, which was enacted as an amendment to PERA in 2011, provides, in pertinent part:

increased costs of maintaining health insurance benefits after the expiration of a CBA. There is no merit to charging parties' contentions.

Affirmed.

/s/ Kathleen Jansen
/s/ Patrick M. Meter
/s/ Jane M. Beckering

---

(1) Except as otherwise provided in this section, after the expiration date of a collective bargaining agreement and until a successor collective bargaining agreement is in place, a public employer shall pay and provide wages and benefits at levels and amounts that are no greater than those in effect on the expiration date of the collective bargaining agreement. The prohibition in this subsection includes increases that would result from wage step increases. *Employees who receive health, dental, vision, prescription, or other insurance benefits under a collective bargaining agreement shall bear any increased costs of maintaining those benefits that occur after the expiration date.* The public employer may make payroll deductions necessary to pay the increased costs of maintaining those benefits. [Emphasis added.]