*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TECHNICAL, PROFESSIONAL AND
OFFICEWORKERS ASSOCIATION OF
MICHIGAN,

FOR PUBLICATION
January 7, 2021
9:00 a.m.

      Respondent-Appellant,

v

No. 351991
MERC
LC No. 00-000034

DANIEL LEE RENNER,

      Charging Party-Appellee.

Before: O'BRIEN, P.J., and M. J. KELLY and REDFORD, JJ.

REDFORD, J.

Respondent appeals as of right the Michigan Employment Relations Commission's (MERC) decision and order affirming an administrative law judge's (ALJ) decision and recommended order. The ALJ found that respondent's pay-for-services procedure violated respondent's duty of fair representation and § 10(2)(a) of the Public Employment Relations Act (PERA), MCL 423.201 *et seq.*, by unlawfully discriminating against charging party Daniel Renner, a nonunion member, and restraining him from exercising his § 9 statutory rights by refusing to represent him in a disciplinary dispute with the employer unless he paid respondent a fee for its services. MERC considered respondent's exceptions to the ALJ's decision and ruled that they lacked merit. MERC found that respondent's pay-for-services procedure violated § 10(2)(a) by discriminating against nonunion employees and restrained them from exercising their § 9 statutory rights to refrain from joining or assisting a labor organization and respondent breached its duty of fair representation by refusing to file or process Renner's grievance unless he paid a fee for its services. We affirm.

## I. BACKGROUND

Renner, an employee of Saginaw County's grounds department, opted out of union membership in 2017 as permitted under §§ 9 and 10(3) of PERA. On September 6, 2018, Renner sent an e-mail to the Director of Maintenance of the County of Saginaw, Bernard G. Delaney, Jr. regarding another employee smoking around Renner and the effect it had on his health. On

September 19, 2018, Director Delaney responded in writing to Renner. In his response, Delaney concluded Renner had made false claims against fellow employees and he provided Renner a written warning that included a caution that "Any further incidents will lead to progressive disciplinary action, up to and including discharge." On September 20, 2018, Renner filed a document with Delaney which Renner described as a grievance procedure in accordance with Saginaw County Policy Number 300, number 337 and Policy 6.1.1 filing an appeal to his department head. Likewise, on September 20, 2018, Renner advised the president of the union local that he had submitted a grievance. On September 21, 2018, the business agent of the local union advised Renner that if he needed assistance in the grievance he would have to pay fees to the local.

On September 26, 2018, Delaney responded to Renner in writing stating:

First, it should be noted that the grievance was filed in accordance with County Policy Number 337, Grievance Procedure. In section 6.1 of the policy, it indicates that regular full time and regular part-time employees not covered by a collective bargaining agreement shall have the right to use this grievance procedure. As your position is part of TPOAM, I do not believe you can use this procedure as you are covered by a collective bargaining agreement. Therefore, I believe the grievance should be denied for that reason.

However, even though I believe the grievance was not filed in accordance with the correct procedure, I am still providing the following response to the grievance:

I have reviewed the information provided by the grievant and believe the disciplinary action taken is still warranted. As such, the grievance is denied.

As indicated above, after receiving the written reprimand in 2018, Renner submitted a Step 1 grievance opposing the reprimand. He also sent an e-mail to respondent asking for the forms needed to complete a Step 2 grievance. Although Renner remained a member of the bargaining unit after opting out of union membership, respondent took the position that it owed Renner no duty to provide "direct representation services" unless he complied with the "Union Operating Procedure: Nonmember Payment for Labor Representation Services" that the union adopted by resolution on July 23, 2018, which required nonmember employees to pay for requested direct representation services.

On September 27, 2018, respondent, through legal counsel, advised Renner that "the only process allowed to pursue a grievance, through the CBA [collective-bargaining agreement] steps, is via the Union," because the county could not directly deal with an individual employee of the bargaining unit in a grievance covered by the CBA. Respondent told Renner that "pursuit of an individual grievance is allowed under section 11 of PERA[.]" The e-mail referred to the "Union Operating Procedure: Nonmember Payment for Labor Representation Services," which it called its "pay-for-services procedure." Respondent's pay-for-services procedure states that a nonmember of the union "shall pay for the services to be rendered, in advance, of the receipt of services . . . ." The resolution adopting the pay-for-services procedure distinguished between "direct labor representation services" and "collective labor representation services." According to the resolution, "direct labor representation services involve representation of a bargaining unit

-2-

member in an individual capacity, in employment related issues including, but not limited to, critical incidents, investigatory interviews, grievance representation and arbitration, and administrative representation." Whereas, "collective labor representation services involve representation of the bargaining unit employees collectively, in circumstances such as collective bargaining, compulsory interest arbitration and certain unfair labor practice proceedings[.]" No payment is required for collective labor representation services.

Renner did not tender the $1,290 required by the union to assist him in the grievance process. The union took no further steps to assist Renner in the grievance process.

In October 2018, Renner filed a PERA charge with MERC alleging that respondent violated its duty of fair representation by demanding a fee in exchange for representation. Respondent admitted the factual grounds of Renner's charge but asserted that it could lawfully require payment for services under its procedure in light of the Supreme Court's decision in *Janus v American Federation of State, Co, & Muni Employees*, 585 US ___; 138 S Ct 2448; 201 L Ed 2d 924 (2018). Respondent sought summary disposition of the charge, arguing that its procedure did not violate any provision of PERA, and constituted action consistent with *Janus* and a decision of the Nevada Supreme Court that found a similar pay-for-services procedure permissible in the context of an analogous right-to-work statutory scheme.[1]

The ALJ denied respondent's motion and found that the pay-for-services procedure violated § 10(2)(a) [MCL 423.210(2)(a)] by unlawfully discriminating against nonunion members and restraining them from exercising their § 9 right to refrain from joining or assisting a labor organization. Respondent filed exceptions to the ALJ's decision which MERC rejected. Respondent now appeals.

## II. STANDARDS OF REVIEW

Our review of MERC decisions is guided by Const 1963, art 6, § 28, and MCL 423.216(e). *Van Buren Co Ed Ass'n v Decatur Pub Sch*, 309 Mich App 630, 639; 872 NW2d 710 (2015). "MERC's findings of fact are conclusive if they are supported by competent, material, and substantial evidence on the record considered as a whole." *Id*., quoting *Branch Co Bd of Comm'rs v Int'l Union, United Auto, Aerospace & Agricultural Implement Workers of America*, 260 Mich App 189, 192-193; 677 NW2d 333 (2003) (quotation marks omitted). "An agency charged with executing a statute is entitled to respectful consideration of its construction of that statute and should not be overruled absent cogent reasons; however, an agency's interpretation cannot bind the courts or conflict with the Legislature's intent as expressed in the statutory language." *Wayne Co v AFSCME Local 3317*, 325 Mich App 614, 634; 928 NW2d 709 (2018). In other words,

---

[1] Respondent relied on a Nevada case, *Cone v Nev Serv Employees Union/SEIU Local 1107*, 116 Nev 473, 998 P2d 1178 (2000), in which the Nevada Supreme Court concluded that a fee for service arrangement that charged the nonunion members for the union's representation of them in grievance proceedings was permissible. In that case, however, the nonunion employees were free to either represent themselves or have a lawyer represent them in any grievance proceeding. In the matter at bar, an employee, whether a union member or not, may only proceed with the grievance process provided for in the collective bargaining agreement with union representation.

although MERC's interpretation of PERA is entitled "respectful consideration," we review de novo legal issues such as statutory interpretation. *Van Buren Co Ed Ass'n*, 309 Mich App at 639. Similarly, we review de novo questions of constitutional law. *Saginaw Ed Ass'n v Eady-Miskiewicz*, 319 Mich App 422, 450-451; 902 NW2d 1 (2017). "MERC's legal determinations may not be disturbed unless they violate a constitutional or statutory provision or they are based on a substantial and material error of law." *Van Buren Co Ed Ass'n*, 309 Mich App at 639, quoting *Branch Co Bd of Comm'rs*, 260 Mich App at 193.

"The primary goal of statutory interpretation is to ascertain the legislative intent that may reasonably be inferred from the statutory language." *Van Buren Co Ed Ass'n*, 309 Mich App at 639, quoting *Krohn v Home-Owners Ins Co*, 490 Mich 145, 156; 802 NW2d 281 (2011). Absent ambiguity in the statutory language, we must enforce the statute as written, "without any additional judicial construction." *Wayne Co*, 325 Mich App at 634. We must also strive to "give effect to every word, phrase, and clause in a statute, avoiding a construction that would render any part of the statute nugatory or surplusage." *Id*. Decisions of the National Labor Relations Board (NLRB) regarding comparable provisions of the National Labor Relations Act (NLRA), 29 USC 151 *et seq*., comparable to PERA provisions, serve as persuasive authority respecting interpretation of PERA. *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 53; 214 NW2d 803 (1974); *Saginaw Ed Ass'n*, 319 Mich App at 446 n 4.

## III. ANALYSIS

Respondent first argues that MERC erred by concluding that the pay-for-services procedure violates PERA. We disagree.

PERA governs public employee labor relations, "reflecting legislative goals to protect public employees against [unfair labor practices] and to provide remedial access to a state-level administrative agency with specialized expertise in [unfair labor practices]" *Wayne Co*, 325 Mich App at 619. Under § 9, public employees are free to organize or join collective bargaining units or, conversely, refrain from doing so. *Saginaw Ed Ass'n*, 319 Mich App at 429. Section 10(1)(a) "prohibits a public employer from interfering with, restraining, or coercing public employees 'in the exercise of their rights guaranteed in section 9.' " *Saginaw Ed Ass'n*, 319 Mich App at 429, quoting MCL 423.210(1)(a). Section 10(2)(a) prohibits labor organizations from restraining or coercing public employees in the exercise of their § 9 rights, but it " 'does not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership.' " *Saginaw Ed Ass'n*, 319 Mich App at 429, quoting MCL 423.210(2)(a).

To protect public employees' rights, § 10(3) provides:

[A]n individual shall not be required as a condition of obtaining or continuing public employment to do any of the following:

(a) Refrain or resign from membership in, voluntary affiliation with, or voluntary financial support of a labor organization or bargaining representative.

(b) Become or remain a member of a labor organization or bargaining representative.

(c) Pay any dues, fees, assessments, or other charges or expenses of any kind or amount, or provide anything of value to a labor organization or bargaining representative.

(d) Pay to any charitable organization or third party any amount that is in lieu of, equivalent to, or any portion of dues, fees, assessments, or other charges or expenses required of members of or public employees represented by a labor organization or bargaining representative.  [MCL 423.210(3).]

In this case, MERC determined that respondent's pay-for-services procedure violated § 10(2)(a) by unlawfully discriminating against nonmembers of the union and restraining employees from exercising their § 9 right to refrain from joining or assisting a labor organization. Respondent argues that MERC erred in this regard because nothing in PERA prohibits the pay-for-services procedure and that § 10(2)(a) explicitly authorizes a union to implement internal rules of the sort at issue in this case.  We disagree.

Respondent maintains that its pay-for-services procedure falls squarely within the § 10(2)(a) proviso allowing a labor organization to "prescribe its own rules with respect to the acquisition or retention of membership."  MCL 423.210(2)(a).  The plain language of the statute, however, cannot be read as respondent contends.  Further, despite repeatedly insisting that this language applies, respondent has not explained how charging nonunion employees for direct representation services can be construed as a rule concerning "acquisition or retention of membership."  The NLRA contains identical language regarding a labor organization's right to prescribe rules "with respect to the acquisition or retention of membership," 29 USC 158(b)(1), and courts have interpreted that language as referring to rules that govern admission or expulsion of employees from the union.  *Pattern Makers' League of North America v Nat'l Labor Relations Bd*, 473 US 95, 109; 105 S Ct 3064; 87 L Ed 2d 68 (1985).  In this case, respondent's pay-for-services procedure applies only to nonunion employees and has no connection to the admission of a member to the union or expulsion of a member from the union.

We note that ¶ 9 of respondent's pay-for-services procedure restricts a nonmember's right to join the union "during the pendency of an employment related issue," and permits the nonmember to "opt-in to dues paying union membership" after the employment related issue has been concluded.  Nevertheless, the primary purpose of respondent's pay-for-services procedure is to require nonunion employees who are members of the collective bargaining unit to pay for direct representation services.  Paragraph 9 of respondent's pay-for-services procedure when read in the context of the entire operating procedure furthers the union's purpose by preventing a nonmember from avoiding payment for requested services by joining the union when the need for direct representation services arises.  In so doing, it advances the purpose of restraining or coercing nonmember employees in the exercise of their statutory rights.

A rule "that invades or frustrates an overriding policy of the labor laws" cannot be enforced without violating the NLRA's prohibition against restraining or coercing employees in the exercise of their statutory rights.  *Scofield v Nat'l Labor Relations Bd*, 394 US 423, 429; 89 S Ct 1154; 22 L Ed 2d 385 (1969).  See also *In re McLeodUSA Telecom Servs, Inc*, 277 Mich App 602, 609; 751 NW2d 508 (2008) ("Statutory language should be construed reasonably, keeping in mind the purpose of the act.") (quotation marks and citation omitted).  Michigan has applied similar

reasoning to PERA. Indeed, in *Saginaw Ed Ass'n*, 319 Mich App at 443-447, this Court agreed with MERC's conclusion that a policy limiting resignation from a union to a one-month period each year violated the "obvious intent" of the right-to-work amendment, which was designed to protect "public employees against barriers to acting on the desire to discontinue union affiliation or support." Thus, even if respondent's pay-for-services procedure could be viewed as a rule regarding acquisition of membership under § 10(2)(a), MERC properly could determine that respondent's pay-for-services procedure is unenforceable under PERA if it impermissibly restrained or coerced employee rights under § 9 or otherwise frustrated the purpose of PERA.

Respondent also emphasizes that, on the issue of fees, PERA only bars charges that are required as a "condition of obtaining or continuing public employment." MCL 423.210(3). Respondent reasons that its pay-for-services procedure does not run afoul of this prohibition because the procedure does not call for denial or termination of employment if an employee declines to pay for direct representation services. Respondent's contention in this regard, while alluring, is not persuasive because respondent's pay-for-services procedure impacts nonmembers' exercise of statutory rights that directly impact continuing public employment. MERC explained:

> Contrary to Respondent's argument, however, we believe that grievance handling is fundamental to a union's duty as the exclusive bargaining agent to represent all members of the bargaining unit without discrimination. Because a union's decision not to represent a unit member in a grievance or disciplinary matter has a clear impact on that unit member's terms or conditions of employment and the terms and conditions of other members of the bargaining unit, it is not merely an internal union matter. Moreover, by requiring non-member payment for representation services, a union interferes with an employee's § 9 right to refrain from union activities. As we noted in *Amalgamated Transit Union, Local 26*, 30 [Mich Pub Emp Rep] 22 (2016) [(Case No. CU16 D-026)], the language of § 10(2)(a) does not permit a union to deny an employee the rights provided by § 9, regardless of whether the union's actions have an impact on conditions of employment.

Respondent argues that by considering whether its pay-for-services procedure impacts "terms or conditions of employment," MERC misapplied concepts used to determine mandatory subjects of collective bargaining.[2] We disagree because MERC did not focus on violation of § 10(3)(c) for

---

[2] Section 15(1) of PERA provides:

> A public employer shall bargain collectively with the representatives of its employees as described in section 11 and may make and enter into collective bargaining agreements with those representatives. Except as otherwise provided in this section, for the purposes of this section, *to bargain collectively is to perform the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to* wages, hours, and *other terms and conditions of employment*, or to negotiate an agreement, or any question arising under the agreement, and to execute a written contract, ordinance, or resolution incorporating any agreement reached if requested by either party, but

its decision to strike down the pay-for-services procedure. MERC's decision clarified that "§ 10(2)(a) does not permit a union to deny an employee the rights by § 9, regardless of whether the union's actions have an impact on conditions of employment" because unions may not restrain or coerce employees in the exercise of their statutory rights. MERC correctly concluded that respondent's pay-for-services violated § 10(2)(a) by discriminating against nonmembers by restraining them from exercising their § 9 rights by refusing to do anything respecting nonmembers' grievances and thereby making it impossible for a nonmember to pursue a grievance unless fees for services are paid.

Section 11 of PERA provides that "[r]epresentatives designated or selected for purposes of collective bargaining by the majority of the public employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the public employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment, and shall be so recognized by the public employer[.]" Substantially identical language in the NLRA has been interpreted as imposing on the representative a corresponding duty of fair representation owed to all members of the bargaining unit. *Ford Motor Co v Huffman*, 345 US 330, 337; 73 S Ct 681; 97 L Ed 2d 1048 (1953). As explained in *Wallace Corp v Nat'l Labor Relations Bd*, 323 US 248, 255-256; 65 S Ct 238; 89 L Ed 216 (1944):

> The duties of a bargaining agent selected under the terms of the [NLRA] extend beyond the mere representation of the interests of its own group members. By its selection as bargaining representative, it has become the agent of all the employees, charged with the responsibility of representing their interests fairly and impartially. Otherwise, employees who are not members of a selected union at the time it is chosen by the majority would be left without adequate representation.

Our Supreme Court has explained that, because PERA is patterned after the NLRA, "PERA impliedly imposes on labor organizations representing public sector employees a duty of fair representation which is similar to the duty imposed by the NLRA on labor organizations representing private sector employees." *Goolsby v City of Detroit*, 419 Mich 651, 660 n 5; 358 NW2d 856 (1984). Respondent does not dispute this well-settled interpretation of PERA and, in fact, recognizes that its duty of fair representation extends to all members of the bargaining unit, regardless of whether they are also dues-paying union members. Respondent, however, contends that this general rule does not apply because nonunion members are treated equally for collective bargaining purposes. We disagree.

"Mandatory subjects of collective bargaining are comprised of issues that 'settle an aspect of the relationship between the employer and employees[.]' " *St Clair Intermediate Sch Dist v Intermediate Ed Ass'n*, 458 Mich 540, 551; 581 NW2d 707 (1998), quoting *Allied Chem & Alkali*

---

this obligation does not compel either party to agree to a proposal or make a concession. [MCL 423.215(1) (emphasis added).]

"The subjects included within the phrase 'wages, hours, and other terms and conditions of employment' are referred to as 'mandatory subjects' of bargaining." *Central Mich Univ Faculty Ass'n v Central Mich Univ*, 404 Mich 268, 277; 273 NW2d 21 (1978), quoting MCL 423.215.

*Workers of America v Pittsburgh Plate Glass*, 404 US 157, 178; 92 S Ct 383; 30 L Ed 2d 341 (1971). Among other recognized topics, mandatory subjects include grievance procedures, *St Clair Intermediate Sch Dist*, 458 Mich at 551, and disciplinary procedures, *Pontiac Police Officers Ass'n v Pontiac*, 397 Mich 674, 677; 246 NW2d 831 (1976). As exclusive representative of Renner's bargaining unit, respondent negotiated a grievance process that governed Renner's employer and all members of the bargaining unit. Although the CBA has not been produced in this case, respondent confirmed that the grievance process must be pursued by the union. An individual employee cannot take advantage of the negotiated process in his or her own right. In other words, respondent secured a valuable right for all members of the bargaining unit including Renner, but through its pay-for-services procedure, effectively foreclosed a nonunion employee's ability to use the grievance process absent payment for services.

Respondent asserts that this outcome did not involve discrimination in violation of its duty of fair representation because: (1) § 11[3] provides a method for nonunion members who are unwilling to pay for direct representation to pursue grievances with the employer directly, and (2) union members also pay for direct representation, albeit through their membership dues. Respondent's first rationale is unpersuasive considering the background of this case. When Renner attempted to pursue a grievance outside of the process outlined in the CBA, his employer, through his supervisor, indicated that the county's standard grievance procedure applied only to employees who were not covered by a CBA and told him that his grievance had been reviewed and denied. Thus, Renner exercised his § 11 rights to no avail, could not invoke his employer's standard grievance procedure applicable only to persons not members of the bargaining unit, and as an employee member of a bargaining unit covered by a CBA, could not exercise the bargained for right to the grievance procedure under the CBA. Renner, therefore, found himself in the position of either paying respondent for direct representation services under respondent's pay-for-services procedure to permit him to pursue the grievance, or refusing to pay and forfeit his contractual right to pursue a grievance under the CBA grievance procedure.

Respondent's second rationale also demonstrates the problematic nature of the pay-for-services procedure. To fully reap the benefits of the CBA, all members of the bargaining unit must pay something, either in the form of membership dues or service fees for direct representation services that are necessary to enforce rights afforded by the CBA. In this case, respondent told Renner that he must pay upfront $1,290, the estimated initial cost of processing Renner's grievance through Step 4. If he did not or could not pay in full, respondent would not take any action on his

---

[3] Section 11 specifies that the designated representative "shall be the exclusive representative of all public employees in a" collective bargaining unit regarding pay, wages, hours, and other conditions of employment,

> and shall be so recognized by the public employer: Provided, That any individual employee at any time may present grievances to his employer and have the grievances adjusted, without intervention of the bargaining representative, if the adjustment is not inconsistent with the terms of a collective bargaining contract or agreement then in effect, provided that the bargaining representative has been given opportunity to be present at such adjustment. [MCL 423.211.]

behalf.  Additional fees would be required if the matter cost more or proceeded beyond Step 4.  Even the preliminary estimate could be cost-prohibitive for many workers, especially considering the short timeframe within which union action must occur as required under the CBA grievance procedure.  Faced with that economic reality, employees who would otherwise exercise their § 9 right to decline union membership could feel compelled to join the union, if only to avoid the risk of forfeiting pursuit of a meritorious grievance.  Given the effect of the pay-for-services procedure, MERC's decision and order did not involve a substantial and material error of law.  MERC's decision properly interpreted and applied applicable law.

Next, respondent argues that MERC failed to appreciate the significance of the United States Supreme Court's *Janus* decision which it contends negated the rationale of the older NLRB decisions relied on by MERC.  Respondent also argues that, in the wake of *Janus*, MERC should have relied on the reasoning stated by the Nevada Supreme Court in *Cone,* 116 Nev 473, which upheld a comparable pay-for-services procedure.  We disagree.

In *Janus*, 585 US ___; 138 S Ct 2448, the United States Supreme Court considered whether an Illinois statute that authorized unions to assess nonunion public employees "agency fees" to cover their proportionate share of union dues attributable to union activities conducted on behalf of nonunion members of the collective bargaining unit violated the First Amendment.  The Court held the state law unconstitutional and overruled its earlier decision in *Abood v Detroit Bd of Ed*, 431 US 209; 97 S Ct 1782; 52 L Ed 2d 261 (1977), which previously held that nonmembers could be charged the portion of union fees attributable to collective bargaining issues.  *Janus*, 585 US at ___; 138 S Ct at 2460.  *Abood* justified its countenance of agency-fee arrangements by relying on the governmental interest in labor peace and avoiding "the risk of free riders . . . ."  *Abood*, 431 US at 224 (quotation marks omitted).  The Court noted that the first rationale had been based on an unfounded assumption that interunion rivalries would foster dissension within the workforce and force employers to face conflicting demands from different unions.  The Court found no historical factual support for that assumption.  *Janus*, 585 US at ___; 138 S Ct at 2465.  Concerning the latter of these justifications, the *Janus* Court determined that avoiding free rider concerns was not a sufficiently compelling interest to overcome First Amendment objections.  *Id*. at ___; 138 S Ct at 2466.  The Court concluded that forcing public employees to subsidize a union they chose not to join and objected to the positions taken by the union in collective bargaining and related activities, violated "the free speech rights of nonmembers by compelling them to subsidize private speech on matters of substantial public concern."  *Id.* at ___; 138 S Ct at 2459-2460.

The Court acknowledged that supporters of agency fees characterized them as unique because unions owe a duty of fair representation to all members of the bargaining unit, regardless of union membership.  *Id*. at ___; 138 S Ct at 2467.  The Court considered that one could argue "that a State has a compelling interest in requiring the payment of agency fees because (1) unions would otherwise be unwilling to represent nonmembers or (2) it would be fundamentally unfair to require unions to provide fair representation for nonmembers if nonmembers were not required to pay."  *Id*.  The Court, however, found neither argument sound and explained:

> First, it is simply not true that unions will refuse to serve as the exclusive representative of all employees in the unit if they are not given agency fees.  As noted, unions represent millions of public employees in jurisdictions that do not

permit agency fees. No union is ever compelled to seek that designation. On the contrary, designation as exclusive representative is avidly sought. Why is this so?

Even without agency fees, designation as the exclusive representative confers many benefits. As noted, that status gives the union a privileged place in negotiations over wages, benefits, and working conditions. Not only is the union given the exclusive right to speak for all the employees in collective bargaining, but the employer is required by state law to listen to and to bargain in good faith with only that union. Designation as exclusive representative thus "results in a tremendous increase in the power" of the union.

In addition, a union designated as exclusive representative is often granted special privileges, such as obtaining information about employees, and having dues and fees deducted directly from employee wages. The collective-bargaining agreement in this case guarantees a long list of additional privileges.

These benefits greatly outweigh any extra burden imposed by the duty of providing fair representation for nonmembers. What this duty entails, in simple terms, is an obligation not to "act solely in the interests of [the union's] own members."

What does this mean when it comes to the negotiation of a contract? The union may not negotiate a collective-bargaining agreement that discriminates against nonmembers, but the union's bargaining latitude would be little different if state law simply prohibited public employers from entering into agreements that discriminate in that way. And for that matter, it is questionable whether the Constitution would permit a public-sector employer to adopt a collective-bargaining agreement that discriminates against nonmembers. To the extent that an employer would be barred from acceding to a discriminatory agreement anyway, the union's duty not to ask for one is superfluous. It is noteworthy that neither respondents nor any of the 39 *amicus* briefs supporting them—nor the dissent—has explained why the duty of fair representation causes public-sector unions to incur significantly greater expenses than they would otherwise bear in negotiating collective-bargaining agreements.

What about the representation of nonmembers in grievance proceedings? Unions do not undertake this activity solely for the benefit of nonmembers—which is why Illinois law gives a public-sector union the right to send a representative to such proceedings even if the employee declines union representation. Representation of nonmembers furthers the union's interest in keeping control of the administration of the collective-bargaining agreement, since the resolution of one employee's grievance can affect others. And when a union controls the grievance process, it may, as a practical matter, effectively subordinate "the interests of [an] individual employee . . . to the collective interests of all employees in the bargaining unit."

In any event, whatever unwanted burden is imposed by the representation of nonmembers in disciplinary matters can be eliminated "through means significantly less restrictive of associational freedoms" than the imposition of agency fees. Individual nonmembers could be required to pay for that service or could be denied union representation altogether. Thus, agency fees cannot be sustained on the ground that unions would otherwise be unwilling to represent nonmembers. [*Id*. at ___; 138 S Ct at 2467-2469 (citations and footnotes omitted; alterations in original).]

Respondent's support of its pay-for-services procedure is premised on the final paragraph of this passage and a footnote to that paragraph. *Id*. at ___ n 6; 138 S Ct at 2469 n 6. Respondent maintains that, via this dicta, the Court provided instructional guidance regarding a union's duty to nonmembers respecting direct representation services and established that the duty of fair representation does not extend to individualized services. According to respondent, MERC erred by denying the significance of *Janus* and relying on outdated NLRB decisions. Close reading of the paragraph and the footnote, within the context of the preceding paragraphs, however, does not support respondent's contention.

MERC correctly understood and properly interpreted *Janus* by recognizing that the case did not involve allegation of a breach of the union's duty of fair representation or restrain of a nonunion employee's statutory rights. Further, MERC correctly concluded that in the passage "the Supreme Court was only expressing its belief that a state statute could be enacted or modified to address a perceived 'free rider' concern that would allow a public sector union to charge a non-member for processing his or her grievance without violating the non-member's First Amendment rights." The Supreme Court did not hold that a union could unilaterally fashion a policy or procedure imposing fees for services on nonunion members of a collective bargaining unit and did not authorize such action.

This conclusion is buttressed by the Court's citation of state statutes as "precedent for such arrangements." *Id*. The Supreme Court cited Cal Gov't Code 3546.3 (West 2010) as its primary example and compared it to the Illinois statute, 5 Ill Comp Stat 315/6(g) (West 2016). The California statute provided that an employee who objects to joining or financially supporting a labor organization on religious grounds cannot be required, as a condition of employment, to join or support the organization. Importantly, the California statute also specified that if the employee "requests the employee organization to use the grievance procedure or arbitration procedure on the employee's behalf, the employee organization is authorized to charge the employee for the reasonable cost of using such procedure." *Id*. According to *Janus*, "[t]his more tailored alternative, if applied to other objectors, would prevent free ridership while imposing a lesser burden on First Amendment rights." *Janus*, 585 US at ___; 138 S Ct 2469 n 6. Thus, *Janus* contemplated state legislative action to create a less restrictive method for responding to the "unwanted burden . . . imposed by the representation of nonmembers in disciplinary matters" but did not endorse or instruct unions to unilaterally impose fees upon nonunion employees within collective bargaining units in which the union enjoys being the exclusive bargaining agents for the bargaining units. *Id*. at ___; 138 S Ct at 2468.

The Michigan Legislature has not enacted a provision in PERA that authorizes respondent's pay-for-services procedure. As explained previously, respondent's procedure has a

coercive effect on an employee's § 9 right to decline union membership in violation of § 10(2)(a). Further, even if we accepted respondent's reading of *Janus* as implicitly removing the duty of direct representation services from the scope of a union's duty of fair representation, the specific procedure adopted in respondent's pay-for-services procedure undermines respondent's fair representation of nonunion members. Grievance procedures are a mandatory subject of collective bargaining, *St Clair Intermediate Sch Dist*, 458 Mich at 551, and the subject CBA plainly provides as such. Respondent conceded below that Renner was entitled to all benefits of the CBA, yet only the union could pursue a grievance under the terms of the CBA. Respondent's duty of fair representation in collective bargaining would be rendered meaningless if it could lawfully secure equal employment rights for all members of the bargaining unit during the collective bargaining process, only to later implement a policy placing potentially prohibitive restrictions on a nonunion member's access to those rights. The combined effect of the negotiated grievance process and respondent's pay-for-services procedure results in unfair, discriminatory treatment of nonunion members—an end at odds with respondent's duty of fair representation. *Janus* does not stand for that proposition.

Considering these implications, respondent's contention that MERC erred by relying on NLRB precedent concerning the general duty of fair representation lacks merit. Respondent's repeated reliance on *Cone* is similarly unpersuasive. *Cone* is clearly distinguishable because nonunion members were not *required* to use, and thus pay for union representation to pursue grievance matters. *Cone*, 116 Nev at 475.

Lastly, respondent argues that MERC's decision violated respondent's First Amendment right to freedom of association. We disagree.

As part of this claim of error, respondent also asserts that MERC misunderstood the nature of respondent's argument regarding this issue. Respondent's exceptions to the ALJ's decision and recommended order included a complaint that requiring respondent to provide direct representation to nonmembers free of charge "is tantamount to compelling the Union to associate with the nonmember in circumstances that are diametrically opposed to the expressive message and viewpoint of the Union, as reflected in the Union's Operating Procedure." In pertinent part, respondent continued, "While the Union recognizes and accepts the non-member for associational purposes in labor representation matters that are 'collective' in nature, i.e., collective bargaining and class action grievances/unfair labor practice proceedings, the expressive message and viewpoint of the Union is to not associate with the non-member under circumstances which mandate, to the detriment of the membership, free direct representation services be given to the non-member." MERC incorrectly treated respondent's exception as though respondent sought to avoid association with nonunion members entirely.

Turning to the merits of respondent's First Amendment argument, the constitutional underpinnings of the freedom of association have been aptly summarized as follows:

> An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed. According protection to collective effort on behalf of shared goals is especially important in preserving political and

cultural diversity and in shielding dissident expression from suppression by the majority. Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends. [*Roberts v US Jaycees*, 468 US 609, 621; 104 S Ct 3244; 82 L Ed 2d 462 (1984) (citations omitted).]

Conversely, "[t]he right to eschew association for expressive purposes is likewise protected." *Janus*, 585 US at ___; 138 S Ct at 2463 (citation omitted).

Respondent relies upon *Boy Scouts of America v Dale*, 530 US 640; 120 S Ct 2446; 147 L Ed 2d 554 (2000), to support its constitutional claim. In that case, the petitioner claimed that requiring it to reinstate the respondent—a former member who had been expelled from the organization because of his homosexuality and role as a gay rights activist—as a member of the organization violated the petitioner's right of expressive association. *Id*. at 644. The Supreme Court agreed. *Id*. The Court explained that "forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Id*. at 648.

As an initial matter, we find respondent's reliance on *Boy Scouts of America* misplaced because respondent's representation of nonunion members in grievance matters is not the type of "forced inclusion" at issue in that case. As explained more fully below, a public accommodations law barring discrimination on the basis of sexual orientation violated the petitioner's expressive association rights because reinstating the respondent's membership in the organization conveyed a message that the petitioner condoned the respondent's homosexuality, in direct conflict with the petitioner's organizational belief that homosexual conduct did not constitute "a legitimate form of behavior." *Id*. at 653.

This sort of message-attribution theory does not apply in this case. Respondent does not suggest that by representing a nonunion member in grievance proceedings, it is somehow endorsing that individual's personal beliefs on any particular subject. And even if union representation implied support of the employee's factual basis for pursing a grievance, rather than mere protection of CBA rights, it is evident that respondent is not concerned about the risk of message or viewpoint attribution in this context. This is evidenced by respondent's willingness to represent nonunion members, as long as they pay union defined fees.

Even if respondent's position fit within the framework of the Court's analysis in *Boy Scouts of America*, respondent's position is still unpersuasive. The Supreme Court began its analysis by determining whether the petitioner was protected by the First Amendment's expressive associational right, which only extends to groups that "engage in some form of expression, whether it be public or private." *Id*. at 648. The petitioner, a private, nonprofit organization engaged in "helping to instill values in young people and, in other ways, to prepare them to make ethical choices over their lifetime in achieving their full potential." *Id*. at 666, 649 (quotation marks omitted). It carried out this mission by having adult leaders spend time with youth members through various recreational activities while instructing the youth members both expressly and by example. *Id*. at 649-650. The Court found that, by conveying a system of values to its youth members, the petitioner undoubtedly engaged in expressive activity. *Id*. at 650.

In this case, there can be little doubt that, as a general matter, respondent engages in expressive activity. A union representing public employees necessarily engages in speech regarding matters of substantial public concern given the nature of its role in the collective bargaining process. *Janus*, 585 US at ___; 138 S Ct at 2474-2475. It negotiates subjects like wages, benefits, and terms and conditions of public employees' employment that have a great impact on governmental spending. *Id.* Nor is it uncommon for unions to engage in political, public relation, or lobbying activities outside of collective bargaining. Because respondent engages in expressive activity, it is generally entitled to expressive associational rights. *Boy Scouts of America*, 530 US at 648.

In *Boy Scouts of America*, the Court next considered whether the state action significantly affected the petitioner's ability to advocate its viewpoints. *Id.* at 650. In doing so, the Court first explored the nature of the expressive message at issue. The petitioner premised its constitutional challenge on its belief that homosexuality was inconsistent with the values the group represented, such as maintaining a "morally straight" and "clean" lifestyle, and the petitioner argued that it did not want to "promote homosexual conduct as a legitimate form of behavior." *Id.* at 650-651 (quotation marks omitted). The Court accepted the petitioner's assertion regarding its message and indicated that it did not need to make further inquiry into the nature of the petitioner's message. *Id.* at 651. Nonetheless, the Court reviewed various statements the petitioner made regarding the issue and opined that the petitioner sincerely held its stated belief. *Id.* at 651-653. Considering this expressive message, the Court found merit in the petitioner's argument, agreeing that inclusion of the respondent in the organization "would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accept homosexual conduct as a legitimate form of behavior." *Id.* at 653.

In this case, respondent claims that MERC's decision interferes with the expressive message and viewpoint reflected in its pay-for-services procedure, which is to "not associate with the nonmember under circumstances which mandate, to the detriment of the membership, free direct representation services be given to the nonmember." This is different from the circumstances involved in *Boy Scouts of America*, where the petitioner's message related to the core values the organization determined to instill in its young members. Although the Court noted that a group "do[es] not have to associate for the 'purpose' of disseminating a certain message," there must be "expressive activity that could be impaired in order to be entitled to protection." *Id.* at 655. Respondent's position is flawed because its characterization of the expressive message allegedly impaired by MERC's decision is not a "message" at all. Respondent has merely reframed the rationale underlying its procedure, without conveying any sort of recognizable ideal, belief, or viewpoint. Simply restating the purpose for a procedure does not transform it into a message. See, e.g., *Parks v City of Columbus*, 395 F3d 643, 651 (CA 6, 2005)[4] (rejecting a city's contention that the collective message of the council organizing an art fair was "to bring visual and performing artists to the City to be enjoyed by those who wish to go to the festival," reasoning that "[t]his is not an expressive message, but merely a purpose for the event"). Accordingly, we reject

---

[4] "Lower federal court decisions are not binding on state courts, but may be persuasive." *Vanderpool v Pineview Estates LC*, 289 Mich App 119, 124 n 2; 808 NW2d 227 (2010) (citation omitted).

respondent's argument that representation of nonunion members free of charge violates its right to expressive association.

We conclude that MERC's findings of fact in this case were supported by competent, material, and substantial evidence on the record considered as a whole.  Further, its decision does not violate a constitutional or statutory provision nor does it constitute a substantial and material error of law.

Affirmed.

/s/ James Robert Redford
/s/ Colleen A. O'Brien
/s/ Michael J. Kelly